# United States Court of Appeals
## For the First Circuit

Nos. 15-1542,
     15-1612

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH BURHOE, a/k/a Jo Jo,
and JOHN PERRY,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise Jefferson Casper, U.S. District Judge]

Before
Torruella, Kayatta, and Barron,
Circuit Judges.

Miriam Conrad, Chief, Federal Public Defender, with whom Judith H. Mizner, Assistant Federal Public Defender, was on brief, for appellant Burhoe.
Michael R. Schneider, with whom Jeffrey G. Harris and Good Schneider Cormier were on brief, for appellant Perry.
Ross B. Goldman, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, Randall E. Kromm, Assistant United States Attorney, Laura Jean Kaplan, Assistant United States Attorney, and Susan G. Winkler, Assistant United States Attorney, were on brief, for appellee.

September 8, 2017

# INDEX

INDEX................................................. 2-3

INTRODUCTION.......................................... 4

I. BACKGROUND......................................... 5

II. HOBBS ACT OVERVIEW................................ 7

    A. The Hobbs Act and Labor Law...................... 7

    B. "Wrongful"...................................... 9

    C. "Property"...................................... 13

III. EXTORTION OF NONUNION COMPANIES.................. 15

    A. Background...................................... 15

        1. Four Pints.................................. 15

        2. Brigham and Women's Hospital................ 17

        3. U.S. Green Building Council & Wolfgang Puck Catering.................................... 17

        4. Great Bridal and Westin Waterfront Hotel...... 19

        5. Massachusetts General Hospital.............. 19

    B. Analysis........................................ 20

IV. EXTORTION OF UNION MEMBERS........................ 43

    A. Background...................................... 44

        1. Edward Flaherty............................. 45

        2. James Lee................................... 47

        3. Robert Wellman.............................. 48

        4. 2009 CBA vote............................... 49

    B. Analysis........................................ 50

      1. LMRDA Rights.................................. 50

      2. Wages and Benefits............................ 53

          a. Property................................. 53

          b. Consent.................................. 59

          c. Threats.................................. 61

V. RACKETEERING AND REMAINING CONSPIRACY COUNTS............ 66

VI. PROHIBITION AGAINST CERTAIN PERSONS HOLDING OFFICE..... 69

VII. CONCLUSION........................................... 75

**TORRUELLA**, **Circuit Judge**.  This case involves an attempt by the federal government to use the Hobbs Act to police the activities of members of a labor union.  Joseph Burhoe and John Perry, who are union members, challenge the sufficiency of the evidence of their convictions for, inter alia, extortion under the Hobbs Act, as well as the jury instructions with respect to that offense.  The government attempted to prove that the defendants extorted property from nonunion companies when they threatened to take certain actions, including picketing, if those companies did not give union members jobs.  The government further charged that the defendants extorted wages, benefits, and rights to democratic participation within the union from their fellow union members.

We sustain the convictions of both defendants on count 29 under 29 U.S.C. § 504(a).  We vacate the conviction for extortion of a nonunion company on count 4 and remand for a new trial because the jury instructions allowed the jury to convict upon a finding that the work performed was merely unwanted.  On all other counts, we reverse the convictions.

This case is factually complex. We therefore will initially set out only the most basic relevant facts and leave to later sections a more detailed exposition.

Teamsters Local 82 ("Local 82" or "the Union") was a division of the International Brotherhood of Teamsters ("Teamsters") located in South Boston. Its members worked at trade shows and other events in Boston. This work included bringing in materials and setting up events ("load-in") and dismantling and removing materials from events ("load-out"). Most of the work occurred at the Hynes Convention Center and the Boston Convention and Exhibition Center, both of which require the use of union labor. Three local companies dominated the trade show industry: Freeman Decorating Services, Champion Exposition Services, and Greyhound Exposition Services. The Union negotiated Collective Bargaining Agreements ("CBAs") with those companies. The Union also sought work at locations that did not have CBAs with the Union, including area hotels. Local 82 had a unit called

---

[1] When we evaluate an appeal from the denial of a motion for acquittal we examine the evidence in the light most favorable to the verdict. United States v. Sturm, 870 F.2d 769, 770 (1st Cir. 1989); see also United States v. Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010).

the "strike unit" that would pursue jobs with employers currently using nonunion labor.

The indictment at issue here covers a period between 2007 and 2011. The Union had approximately 600 members during this time period. During this time the head of Local 82 was John Perry. Joseph Burhoe became a member of Local 82 in 1987, but was inactive for many years until he resumed active participation in 2007. He held no official position within the Union but was seen by many union members to be Perry's right-hand man. Perry and Burhoe were charged with extorting nonunion employers and other union members in a thirty-count indictment.[2] They were also both charged with violating a prohibition against persons with certain criminal convictions serving in particular capacities within the Union. They were jointly tried in a trial that lasted over six weeks. Burhoe and Perry were each found guilty of racketeering, racketeering conspiracy, conspiracy to extort and extortion of nonunion companies and union members, and serving (or allowing a person to serve, respectively) in a prohibited union capacity.

---

[2] Two other union members were also charged in the indictment. One, Thomas Flaherty was acquitted on all counts. The second, James Deamicis, was acquitted on some counts and had a hung jury on the balance. He was later tried and convicted of some counts. His appeal is separately pending.

## II. HOBBS ACT OVERVIEW

The Hobbs Act provides in pertinent part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).  This same Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  Id. § 1951(b)(2).

### A.   The Hobbs Act and Labor Law

The Hobbs Act explicitly states that its provisions do not "repeal, modify or affect" certain labor law provisions, including the National Labor Relations Act ("NLRA").  18 U.S.C. § 1951(c); see also 29 U.S.C. §§ 151-166.  The NLRA "is a comprehensive code passed by Congress to regulate labor relations in activities affecting interstate and foreign commerce." Tamburello v. Comm-Tract Corp., 67 F.3d 973, 976 (1st Cir. 1995) (quoting Nash v. Fla. Indus. Comm'n, 389 U.S. 235, 238 (1967)). It "reflects congressional intent to create a uniform, nationwide body of labor law interpreted by a centralized expert agency -- the National Labor Relations Board (NLRB).  Accordingly, the NLRA

-7-

vests the NLRB with primary jurisdiction over unfair labor practices." Id.

The Supreme Court has held that "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference in national policy is to be averted." Id. (quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 245 (1959)). This is known as Garmon preemption and is generally taken to mean that when there is a question of how § 7 or § 8 of the NLRA should be interpreted, the NLRB's interpretations of that Act control. See Chaulk Servs., Inc. v. Mass. Comm'n Against Discrimination, 70 F.3d 1361, 1364-65 (1st Cir. 1995).

Of central concern, under this doctrine, is the desire "to shield the system from conflicting regulation of conduct." Id. at 1365.[3] In United States v. Enmons, 410 U.S. 396 (1973), the Supreme Court cited to Garmon in narrowly construing the Hobbs

---

[3] Garmon preemption does not preclude the states from regulating criminal or tortious conduct that is of "merely peripheral" concern to federal labor policy or that touches a state's compelling interest "in the maintenance of domestic peace." Garmon, 359 U.S. at 243, 247. Rather, as the Court explained in Garmon, if Congress wishes for the federal labor laws to preempt such state regulation, it must clearly say so. Id. at 247.

Act so as to avoid creating a conflict with federal labor law. Id. at 411.

### B. "Wrongful"

We are of the view that the resolution of issues inherent in the overlap between the Hobbs Act and labor law (and its limits) is guided, at least in part, by Enmons. There, violence had "erupted" during the course of a lawful strike aimed at compelling an employer to accept certain provisions providing for higher wages in a CBA that was under negotiation. United States v. Enmons, 335 F. Supp. 641, 643 (E.D. La. 1971). While the violence was undoubtedly unlawful, the question before the Court was whether that violence qualified as Hobbs Act extortion when the end sought (higher wages through agreement to certain terms in a CBA) by means of an otherwise lawful strike was a legitimate labor objective under the labor union laws.

The Supreme Court stated that the term "wrongful," as included in the Hobbs Act's definition of extortion, "has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." Enmons, 410 U.S. at 400. Instances that the Court cited included "where union officials threatened force or violence against an employer in order to obtain personal payoffs,"

and "where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers." Id. (internal citations omitted). Enmons states that the Hobbs Act does not apply, however, to

> the use of violence to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks. In that type of case, there has been no "wrongful" taking of the employer's property; he has paid for the services he bargained for, and the workers receive the wages to which they are entitled in compensation for their services.

Id.

Thus, Enmons arguably could be read to say that what constitutes a "wrongful" taking by a labor union or its members, such that it would constitute "extortion" under the Hobbs Act, necessarily depends on whether the ends are "legitimate union objectives" as defined in the labor laws. And thus, under Enmons, conduct arguably is not "wrongful" under the Hobbs Act when taken in pursuit of a legitimate labor objective, even if "force, violence, or fear" is used to carry it out. 18 U.S.C. § 1951(b)(2).

In the wake of Enmons, however, a number of courts, including our own, have questioned whether Enmons's analysis of the importance of the legitimacy of the end sought to the "wrongful" inquiry should be applicable beyond cases in which

-10-

violence occurs during a lawful strike to obtain a collective bargaining agreement.  See United States v. Porcaro, 648 F.2d 753, 759-60 (1st Cir. 1981) (distinguishing Enmons in part on the ground that it is "a labor case dealing with the unique problem of strike violence"); see also United States v. Debs, 949 F.2d 199, 201 (6th Cir. 1991) (noting that "Enmons has not been extended beyond its own facts" and declining to hold that "because some illegality in union activity is justifiable every illegality . . . must also be within the orbit of Enmons"); United States v. Jones, 766 F.2d 994, 1002 (6th Cir. 1985) (reserving the question of whether Enmons applies "to the use of violence outside of the collective bargaining context and in pursuit of goals other than higher wages"); United States v. Cerilli, 603 F.2d 415, 419 (3d Cir. 1979) ("The Court's reasoning [in Enmons] was obviously and explicitly tied to the labor context and more specifically to the strike context.  Any application of Enmons to cases outside of that context must be done with caution.").

Setting aside the issue of "wrongful" ends on which Enmons itself turned, there is also another principle in play -- namely, that the means used to obtain the end must also be "wrongful."  United States v. Kattar, 840 F.2d 118, 123 (1st Cir. 1988).  The Hobbs Act references the means used to obtain property through the phrase "actual or threatened force, violence, or fear."

-11-

18 U.S.C. § 1951(b)(2). The meaning of that phrase has been developed from a broad range of subsequent Hobbs Act cases and is not unique to situations involving labor unions. The threat may be explicit or implied. Sánchez v. Triple-S Mgmt. Corp., 492 F.3d 1, 13 (1st Cir. 2007); United States v. Rivera-Rangel, 396 F.3d 476, 484 n.7 (1st Cir. 2005). With respect to the use of fear, "[w]hat is required is evidence that the defendant knowingly and willfully created or instilled fear, or used or exploited existing fear with the specific purpose of inducing another to part with property." United States v. Coppola, 671 F.3d 220, 241 (2d Cir. 2012) (citations omitted).

With respect to whether such means are "wrongful," we have made clear that the use of actual or threatened violence or force is "inherently wrongful," United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989), as is the use of fear of physical harm. Kattar, 840 F.2d at 123. Fear of economic loss, however, is also a type of fear. Rivera-Rangel, 396 F.3d at 483. But because fear of economic harm is a part of many legitimate business transactions, see Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 503, 509 (3d Cir. 1998), the use of economic fear is not necessarily "wrongful" for Hobbs Act purposes. Kattar, 840 F.2d at 123. The use of economic fear is rendered wrongful under the Hobbs Act, however, "when employed to achieve

-12-

a wrongful purpose." Id. (quoting United States v. Clemente, 640 F.2d 1069, 1077 (2d Cir. 1981)). Thus, we have held that "the use of legitimate economic threats" to procure property is "wrongful" under the Hobbs Act "only if the defendant has no claim of right to that property" and knew as much. Sturm, 870 F.2d at 773-74.

C. "Property"

Also at issue in this case is how the Hobbs Act defines property. The indictment in this case alleges that each defendant extorted fellow union members of (1) wages and benefits and (2) rights to participate in union affairs.

The Supreme Court has refined the property element of the Hobbs Act by focusing on the word "obtain," emphasizing that extortion under the Act requires not only that a victim be deprived of his or her property, but also that the perpetrator acquire it. Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 403-404 (2003). Thus, in order to commit Hobbs Act extortion an individual "must 'obtain' property from another party." Id. at 404. Scheidler involved allegations that a group of anti-abortion activists committed various acts in attempts to "shut down" abortion clinics. Id. at 398. There was no dispute that this group "interfered with, disrupted, and in some instances completely deprived respondents of their ability to exercise their property rights" in various ways including via criminal acts. Id.

-13-

at 404. However, the Supreme Court held that these acts were not extortion because even when the activists succeeded at "shutting down" an abortion clinic, they "did not 'obtain' [the clinic's] property" and they "neither pursued nor received 'something of value from' respondents that they could exercise, transfer, or sell." Id. at 405 (quoting United States v. Nardello, 393 U.S. 286, 290 (1969)).

The Court found that if the requirement that the property be obtained were eliminated, the result would be to collapse the distinctions between extortion and the "separate crime of coercion." Id. Coercion involves "the use of force or threat of force to restrict another's freedom of action" and, at the time the Hobbs Act was passed by Congress, was seen "as a separate, and lesser, offense than extortion." Id. The fact that when Congress drafted the Hobbs Act it omitted coercion provides strong evidence that the lesser offense (coercion) was not to be included within the meaning of the greater offense (extortion) in the Hobbs Act. Id. at 406.

The Court further refined this definition in Sekhar v. United States, holding that obtaining property "requires that the victim 'part with' his property and that the extortionist 'gain possession' of it." 133 S. Ct. 2720, 2725 (2013) (quoting Scheidler, 537 U.S. at 403 n.8) (internal citation omitted). The

-14-

key, according to Sekhar, is that "[t]he property extorted must therefore be transferable -- that is, capable of passing from one person to another." Id. at 2725.

### III. EXTORTION OF NONUNION COMPANIES

#### A. Background

Burhoe and Perry each faced numerous counts of alleged extortion of nonunion companies. In each instance the indictment specified that the defendants had extorted

> money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services; with the consent of [the company], its officers and other agents, which consent was induced by the wrongful use of fear of economic and physical harm to [the company] and others, in order to obtain wages for such imposed, unwanted, and unnecessary and superfluous services for themselves, their friends and family members.

Burhoe was found guilty of four separate counts of extorting nonunion companies while Perry was found guilty of one.

#### 1. Four Pints[4]

Four Pints ran for-profit beer tasting events at the Boston Park Plaza Castle, a local hotel. Four Pints had no employees beyond the three owners and used volunteers organized by a now-defunct charity, Hugs and Halos, to set up events. The charity received a donation from Four Pints in addition to tips earned during the event. The volunteers Hugs and Halos provided

---

[4] Burhoe: Racketeering Act 2, Count 4.

were typically college students who received a t-shirt and free food and beer in exchange for their help.

The previous owner of Four Pints had told his successors that Local 82 had a dispute with the hotel over the use of nonunion labor at events. He told them that he paid union workers for their events, but apparently provided few details of the agreement. During set up of a show in September 2008, Burhoe and another man came to speak with Conor Brennan, one of the new owners. Burhoe told Brennan that they needed to use union workers. The conversation escalated and became heated. Burhoe's tone was described as "harsh and aggressive."

Another owner, Shawn Rich, testified that it was his understanding that Burhoe "wanted work," that union members showed up to work but that he never saw them do any work. Brennan testified that they did no work and he did not expect them to perform any work. Both Rich and Brennan testified that they believed that if they did not hire some union workers the union would picket. They believed a picket would hurt their show and was a "risk we really didn't want to take." The union workers were paid with checks, although the payee's name was always left blank. Payments were made approximately six or seven times over a period of a number of years.

### 2. Brigham and Women's Hospital[5]

Brigham and Women's Hospital ("BWH") held a fundraiser put on by Rafanelli Events at the Intercontinental Hotel in Boston in September 2008. During set up for the fundraiser Burhoe approached Erin Davies, who worked for Rafanelli Events, and asked if she knew that the loading dock was a union facility and that using outside vendors gave the union the right to picket. She testified that he was confrontational, though she also testified that she did not feel intimidated. She believed that if they did not hire union workers, there would be a picket, and she worried that a picket would interfere with the event. Her boss told her to hire some union members for load-out. Davies testified that they did not need labor for the load-out as they already had "hired staffers to do everything we needed to do." One or two men came to work and Davies testified that she personally saw one working. The union sent invoices for the work and checks were issued to two workers.

### 3. U.S. Green Building Council & Wolfgang Puck Catering[6]

The U.S. Green Building Council held an event at the Institute of Contemporary Art ("ICA") in November 2008. Wolfgang

---

[5] Burhoe: Racketeering Act 3, Count 5.

[6] Burhoe: Racketeering Act 5, Count 7.

Puck catered and produced the event. As nonunion workers began setting up the event, a union member approached an event manager for Wolfgang Puck, William Doane, and told him he needed to hire union members. Doane described the person as being "right in my face" and using an "aggressive" tone. He said that he felt "threatened" and "the threat was made that if we didn't put them on there, that they would have a hundred guys picketing down here within an hour on the event." Doane consulted with the director of the ICA and they decided to hire some union members. Doane testified that they did not need the additional workers but that they hired them in order to avoid the picket. Doane testified that he was too busy to know whether the union members performed any work at all. A manager with another vendor, Cary Sakaki, also reported being approached by union members at this event. She testified that she called her account manager and they decided to hire some union members for the load-in and the load-out at the end of the day. She further testified that the work was unneeded as they were fully staffed, but she also testified that the union members actually worked.

### 4. Great Bridal and Westin Waterfront Hotel[7]

In September 2010, Walter Mills, a production manager for Great Bridal, was overseeing set-up of a show using nonunion workers. Burhoe approached Mills twice seeking work for union members. Mills rejected him after the first approach, telling Burhoe that he had all the workers that he needed. The second time, Burhoe threatened to picket and block the loading dock so that vendors could not get in. Mills testified both that Burhoe's tone was aggressive and that it was "pretty matter of fact, either you hire us or we're going to picket." Great Bridal and the hotel decided to hire the union in order to avoid a picket. Two members showed up for the load-out. Mills testified that "[t]hey mostly stood around, but whenever we needed to push something heavy, they'd have their hands on it." He further testified that he "understood throughout this that the Teamsters were asking to be hired to load and unload equipment."

### 5. Massachusetts General Hospital[8]

Perry was found guilty of one count of extorting a nonunion employer. On October 24, 2009, Massachusetts General Hospital ("MGH") hosted a fundraising event at the Westin

---

[7] Burhoe: Racketeering Act 11, Count 13.

[8] Perry: Racketeering Act 9, Count 11.

Waterfront Hotel.  Perry approached Kenneth Maas, who worked for an audio/visual services provider and was involved with the set-up, and threatened a picket if union members were not hired.  Maas testified that Perry approached him to object to his use of nonunion labor and said "[w]ell you got in here nonunion, but you're not getting out of here nonunion."  Maas further testified that the event was fully staffed and that he did not need any help from Local 82 members.  According to Maas, the discussion with Perry made him "nervous" and he felt like he was "being manipulated," though he also testified that Perry was "polite and friendly."  Maas knew that what Perry was threatening was a picket. He discussed the situation with MGH who decided to hire some union workers.  The men who were hired "did the work."  MGH received a form invoice for the work, which they subsequently paid.

### B.  Analysis

The defendants contend both that the District Court erroneously instructed the jury on the "wrongful" element of Hobbs Act extortion, 18 U.S.C. § 1951(b)(2), and that the evidence was insufficient to permit the jury to find that the defendants had committed that crime.  We begin with the defendants' challenge to the jury instructions.  Our review of "whether the instructions conveyed the essence of the applicable law" is de novo, as the objection was preserved below, United States v. Sasso, 695 F.3d

-20-

25, 29 (1st Cir. 2012), and the government does not argue otherwise.

The District Court gave the following instructions to the jury on the crime of extortion under the Hobbs Act:

> [I]n proving the crimes of extortion alleged against the defendants, the government must prove beyond a reasonable doubt the element of extortion. That is, the obtaining of the property of another with consent induced by the wrongful use of actual or threatened force, violence or fear including fear of economic loss or physical harm. Picketing and striking are legally protected labor activities when they are to achieve legitimate labor objectives even if they put economic pressure on a company or an employer. That is, in the labor context, use of actual or threatened force, violence or fear including fear of economic loss or physical harm is not wrongful under federal law if such use is to achieve legitimate labor objectives, example, higher wages, as opposed to illegitimate objectives, example, personal payoffs or payment for imposed, unwanted, superfluous or imposed, unwanted, and fictitious work.

With respect to the distinction between legitimate and illegitimate labor objectives, the instructions further provided that

> Obtaining jobs and wages for union members is a legitimate union objective. Obtaining personal payoffs or wages for imposed, unwanted, and superfluous work or imposed, unwanted or fictitious work is not. It is not impermissible for unions to identify work that is being performed by nonunion workers or volunteers that could be performed by union members and to attempt to obtain that work.

Under these instructions, the jury could find the defendants liable for using or threatening violence, force, or

-21-

fear, including fear of economic loss, only if such activity was undertaken in pursuit of an illegitimate labor objective. And the instructions emphasized that "[p]icketing" is a "legally protected labor activit[y]" when engaged in "to achieve legitimate labor objectives," even if such picketing puts "economic pressure on a company or an employer." The instructions then expressly identified seeking higher wages and jobs for union members (including turning those jobs around from nonunion workers) as legitimate labor objectives.[9]

At the same time, however, the instructions allowed the jury to conclude that the defendants had pursued an illegitimate labor objective by finding that the defendants sought personal payoffs or payment for unwanted and superfluous, as opposed to "fictitious," work, in consequence of the use of the word "or" between "imposed, unwanted, superfluous" and "imposed, unwanted, and fictitious" in the instructions. And the instructions suggested that even peaceful picketing might constitute the

---

[9]  The instructions did not distinguish between types of picketing. Although some forms of pickets constitute unfair labor practices under 29 U.S.C. § 158(b), the NLRA protects a so-called area-standards picket, which seeks to alert the public that a particular employer pays lower wages to nonunion workers than a union worker in that area would receive. See Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters, 436 U.S. 180, 185-87 (1978); see also Giant Food Mkts, Inc. v. NLRB, 633 F.2d 18, 23 & n.11 (6th Cir. 1980) (approving of area-standards picketing).

"wrongful" use of fear of economic harm when used to procure such unwanted work. As a result, the instructions, read as a whole, permitted the defendants to be convicted for the following conduct: threatening to picket peacefully in order to obtain payment for "unwanted" work, even if the work that the defendants sought was for actual jobs for union members at the prevailing wage.

The defendants objected to the instructions as "misleading" in its description of "wrongful." They argued that the disjunctive construction in the instructions' description of when union efforts to procure work is illegitimate relieved the government from having to prove that the work was "fictitious" and thereby impermissibly allowed the jury to find a violation of the Hobbs Act for peaceful picketing for union jobs at the prevailing wage simply because the employer did not "want" the union members to perform the work that they sought through their picketing. The defendants contended in this regard that seeking to turn jobs around for union workers at the prevailing wage is a legitimate labor objective even if the work sought by the union is unwanted and superfluous, in the sense that someone else is already performing that work so the employer does not want to hire the union workers. In the defendants' view, therefore, the union's pursuit of union jobs at the prevailing wage through peaceful picketing would violate the Hobbs Act only if the work sought is

-23-

fictitious, in the sense that the employer did not need anyone to perform that work, as is the case with sham wage payments or payment for no-show jobs. Thus, the defendants objected to the instructions regarding "wrongful" as "misleading."

As it turns out, the jury appeared to be confused by the instructions that the District Court gave on the exact point the defendants identified as problematic, and the jury asked the court for "more specific instruction" on the meaning of "unwanted, unnecessary, and superfluous." "If a vendor/event planner had adequate labor to do their own load-in and load-out but felt compelled to hire union labor to avoid a disruption of their event," the jury asked the court, "would that make the work done by the [union] imposed, unwanted, and unnecessary and superfluous?" After the jury asked for clarification, the defendants urged the court to issue the defendants' proposed instruction that union efforts to turn around nonunion jobs to maintain the prevailing wage are illegitimate only if those jobs are "fictitious," not merely unwanted, unnecessary, and superfluous. Instead, the court responded to the jury by referring it to the court's original instructions.[10]

---

[10] Later, one of the jurors again sought clarification from the court, asking: "Can the union picket for illegitimate labor objectives?" As the defendants argued to the court at the time, the question might have suggested continued confusion over the instructions. On one hand, the defendants pointed out, the court

-24-

In challenging those instructions on appeal, the defendants rely in part on Enmons, in which the Supreme Court described union efforts "to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers" as an example of an illegitimate labor objective under the Hobbs Act. 410 U.S. at 400 (emphasis added). The Court's use of "and" before "fictitious," the defendants contend, means that the work must also be fictitious in order for the union efforts to be illegitimate.

Moreover, the defendants point out, the language from Enmons was taken from another Supreme Court decision that blessed an indictment charging union members under the Hobbs Act with attempts to obtain "wages to be paid for imposed, unwanted, superfluous and fictitious services." Green, 350 U.S. at 417. At issue in Green was a challenge to the indictment, which charged activity that the union members argued did not fall within the scope of the Hobbs Act. Id. at 416. That activity involved attempts by the union workers "through threats of force or violence," id. at 420, to secure work as "swampers" from bulldozer

_____

had instructed the jury that picketing is a legally protected labor activity (even if undertaken to turn around nonunion jobs),yet the court had also instructed the jury that seeking unwanted work was an illegitimate labor objective. The court again referred the jury to its initial instructions on those points.

operators who had no use for any swampers, whether union or nonunion. United States v. Green, 246 F.2d 155, 158-59 (7th Cir. 1957).[11] (A swamper's "primary duty" was said to be "to scout ahead of bulldozers and warn of approaching pitfalls." Id. at 158.) The Court held "that the acts charged against [the union members] fall within the terms of the [Hobbs] Act." Green, 350 U.S. at 421. Notably, the defendants contend, the indictment that the Court blessed required that the work be "fictitious" in order for Hobbs Act liability to attach. Id. at 417.

Finally, the defendants also turn to the federal labor laws in support of their challenge to the jury instructions. The defendants contend that federal labor laws support their claim that union efforts to procure unwanted and superfluous work is a legitimate labor objective, when those efforts are undertaken in order to turn around a nonunion job to maintain the prevailing wage, so long as the work that is sought for union members is not fictitious. As they point out, those laws are not superseded by the Hobbs Act, which expressly provides that it "shall not be

---

[11] In one instance in which the bulldozer operators had declined to hire swampers, later that day 700 to 1500 union members converged on the job site, ordered a bulldozer operator to "alight," and threatened to "bash his head in" and "throw his car in the canal." Green, 246 F.2d at 159.

construed to repeal, modify or affect" various provisions of the federal labor laws, including the NLRA. 18 U.S.C. § 1951(c).

In pressing this contention, the defendants assert that the District Court erred by refusing to adopt a proposed instruction that cited to NLRB v. Gamble Enter., a case interpreting one of those provisions in the NLRA. 345 U.S. 117 (1953). Gamble potentially bears on the question of what constitutes a legitimate labor objective because it sets forth the controlling interpretation of an unfair labor practice under § 8(b)(6) of the NLRA. That provision specifies that it is an "unfair labor practice" for a union "to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed." 29 U.S.C. § 158(b)(6).

In Gamble, a union of local musicians sought employment by a theater, which neither wanted nor needed the local musicians' services, as a condition of consenting to the performance at the theater by traveling musicians, whose own union had an agreement with the local union not to perform without its consent. Gamble, 345 U.S. at 119-21. The NLRB had determined that there is no exaction "for services which are not performed or not to be performed" within the meaning of § 158(b)(6) "where a labor

-27-

organization seeks actual employment for its members, even in situations where the employer does not want, does not need, and is not willing to accept such services." In re Am. Fed'n of Musicians, Local No. 24, 92 N.L.R.B. 1528, 1532-3 (1951). On review, the Supreme Court indicated that the key question was whether "the union was seeking actual employment for its members." Gamble, 345 U.S. at 123. Finding that it was, the Supreme Court rejected the theater's claim that the union was engaged in an unfair labor practice under § 158(b)(6). Id. ("Since we and the Board treat the union's proposals as in good faith contemplating the performance of actual services, we agree that the union has not, on this record, engaged in [an unfair labor practice within the meaning of § 158(b)(6)].").

The crucial distinction the NLRB made in construing § 158(b)(6), and which the Supreme Court embraced, was between whether the union "was attempting to cause the charging party to make payments to [union members] for services which were not to be performed," or whether the "labor organization [was] seek[ing] actual employment for its members, even in situations where the employer does not want, does not need, and is not willing to accept such services." Id. at 122 (quoting Am. Fed'n of Musicians, 92 N.L.R.B. at 1531, 1533). The former cannot constitute a fair labor practice under § 158(b)(6) while the latter can. The

Supreme Court explained that the central inquiry was whether the union was "in good faith contemplating the performance of actual services." Id. at 123. In such a situation, despite the union's effort to "exact[]" the wage, it is up to the employer to "accept or reject the union's offers on their merits in light of all material circumstances." Id.

In considering the defendants' arguments challenging the jury instructions, we are not persuaded by the defendants' contention that Enmons and Green necessarily show that the instructions are illegitimate simply because each of those cases uses the conjunctive formulation ("unwanted, superfluous and fictitious") in describing prohibited conduct under the Hobbs Act. Enmons, 410 U.S. at 400 (emphasis added); Green, 350 U.S. at 417 (emphasis added). As the government points out, Enmons also refers at one point, using the disjunctive, to a union's "pursuit of 'wages' for unwanted or fictitious services" as an illegitimate labor objective. 410 U.S. at 407 (emphasis added). And the fact that Green rejected a challenge to a Hobbs Act indictment charging the defendants in that case with seeking fictitious work does not necessarily mean that a showing of fictitiousness is required to prove that union efforts to obtain work for its members constitutes extortion under the Hobbs Act.

Nevertheless, in the context of this case, in which the counts charging extortion of nonunion companies were based in part on threats to picket, we do not see how the instructions were correct. Those instructions permitted the jury to find that the defendants pursued an illegitimate labor objective in seeking "payment for imposed, unwanted, superfluous" work rather than "fictitious" work. But, under the instructions, accepted by the government, the use of picketing for a legitimate labor objective is protected union activity and thus not "wrongful." And, under those same instructions, again, accepted by the government, the effort to turn around nonunion jobs to become union jobs at the prevailing wage is a legitimate labor objective. As a result, we do not see how peaceful picketing in pursuit of turning around jobs to maintain the prevailing wage can be deemed activity in pursuit of an illegitimate labor objective. And, that being the case, we see no basis in the labor laws for concluding that this same objective becomes illegitimate simply because the jobs that the union seeks to turn around are jobs already being performed by nonunion workers. In fact, Gamble and another case decided by the Supreme Court the same day, see Am. Newspaper Publishers Ass'n v. NLRB, 345 U.S. 100 (1953),[12] suggest the opposite is the case,

---

[12] There, a union of typesetters required the newspapers that hired them to pay them for duplicating advertising material that the newspapers did not want or need. Am. Newspaper, 345 U.S. at

-30-

given their construction of what constitutes an unfair labor practice in exacting a wage.

The instructions are problematic, therefore, because they could have led the jury to conclude -- as the defendants contend was the case -- that the effort to turn around such nonunion jobs to maintain the prevailing wage is illegitimate simply because the employer already has nonunion employees doing the relevant work. For this reason, the instructions are misleading in describing what constitutes "wrongful" conduct.

In countering the defendants' challenge to the instructions, the government advances no theory for why Gamble's interpretation of § 158(b)(6) should not guide our analysis of what constitutes a legitimate labor objective under the Hobbs Act, and hence our review of the jury instructions.[13] Nor does the

------

103-04. The Court rejected the newspapers' argument that the union had engaged in an unfair labor practice under § 158(b)(6) merely by seeking this bogus work because the Court explained that the work sought, though unwanted and unneeded, was actual work. Id. at 109-10.

[13] The government does point out that Gamble does not preclude a jury from convicting a defendant under the Hobbs Act for seeking personal payoffs through violence, force, or fear (a point the defendants do not contest). But that argument goes merely to the sufficiency of the evidence to convict for extortion under the Hobbs Act on the theory that the end pursuit was illegitimate because it was for a personal payoff, not to whether the jury instructions in this case were erroneous for permitting a conviction predicated on the use of violence, force, or fear to obtain unwanted work. In addition, the government points out in a footnote that Congress rejected a proposed amendment to the Hobbs

government contend that Gamble is somehow an invalid interpretation of § 158(b)(6).[14]  Indeed, the government's brief reads as though it would have us ignore the NLRA and its definition of an unfair labor practice under § 158(b)(6) in evaluating the instructions.

The government instead argues that the instructions were not misleading because union efforts to procure merely unwanted and superfluous work is an illegitimate labor objective, given that Enmons refers at one point to a union's "pursuit of 'wages' for unwanted or fictitious services" as an example of an illegitimate labor objective under the Hobbs Act.  410 U.S. at 407.  However, as mentioned above, Enmons elsewhere describes union efforts to procure payment for, using the conjunctive, "imposed, unwanted, superfluous and fictitious services" as an

_____

Act that would have made compliance with the NLRA a defense to a charge under the Hobbs Act.  However, the Supreme Court said in Enmons that "it would require statutory language much more explicit than that before us here [in the Hobbs Act] to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes," and we see no reason why that same reasoning would not extend to pickets. 410 U.S. at 411.

[14]  The government points us to no cases suggesting that Gamble (or American Newspaper) is no longer good law.  It does argue that those cases involve negotiations for employment services or a CBA and therefore do not apply here.  Nothing in § 158(b)(6) suggests that it is limited to those contexts, however, and the government points us to no cases supporting an inference that it should be so limited.

example of an illegitimate labor objective.  Id. at 400 (emphasis added).  The one disjunctive reference that the government singles out from Enmons is not necessarily dispositive in all contexts and thus cannot save the jury instructions.

To support its view that we should privilege the disjunctive construction Enmons does use over the conjunctive one it also uses, the government turns to two cases cited by Enmons: United States v. Local 807 of Int'l Bhd of Teamsters, 315 U.S. 521 (1942), and Kemble.[15]  But neither case supports the government's contention.

Enmons, the government points out, explains that the purpose and effect of the Hobbs Act was to overrule Local 807. See 410 U.S. at 402.  Local 807 concerns § 2 of the Anti-Racketeering Act of 1934, 48 Stat. 979, which for our purposes was

---

[15]  The government also points to two cases from our sister circuits to support its argument that Enmons does not require that work be fictitious in order for a union's pursuit of that work to constitute an illegitimate labor objective.  These cases do not, however, involve the pursuit by unions of unwanted labor from an employer through threats of peaceful pickets and thus are of little help in interpreting the lawfulness of the ends sought in this case.  See United States v. Markle, 628 F.3d 58, 62 (2d Cir. 2010) (holding that "a violent attack on members of a competing union to gain the competing union's work is not a legitimate labor union objective within the meaning of Enmons"); United States v. Quinn, 514 F.2d 1250, 1255-60, 1268 (5th Cir. 1975) (affirming convictions under the Hobbs Act for the defendant's exaction of personal payoffs either in exchange for calling off pickets or through threatening pickets).

the same as the Hobbs Act, save for the exception described below. Local 807 involved union activity in and outside of New York City. Union members would wait at the entrances to the city and "use violence and threats" (but not pickets) to stop trucks from entering the city to make deliveries. 315 U.S. at 526. They would then exact a payment from the out-of-town drivers in amounts that were "the regular union rates for a day's work of driving and unloading." Id. Sometimes the union members would then drive the trucks into the city for the delivery themselves. Sometimes the union members offered to do the work but the offer was rejected by the out-of-town drivers. Finally, sometimes the union members did not offer to perform any work at all. Id.

The question for the Supreme Court was whether this activity fell within the wages exception to § 2 of the Anti-Racketeering Act, which excepted "the payment of wages by a bona-fide employer to a bona-fide employee." Id. at 527. The Supreme Court held that the payments to those who had been permitted to actually perform the services, and payments to those whose offers to do the work had been rejected, fell within the wages exception, but that the payment to those who refused to perform the services did not. Id. at 534-35. In response to Local 807, Congress amended the statute, eliminating the wages exception entirely in the revised statute, which is the Hobbs Act.

In relying on Local 807 in defending the jury instructions, the government essentially argues the following. The government contends that, because Congress intended to overrule Local 807 by passing the Hobbs Act, the current statute therefore criminalizes the conduct in all three scenarios from Local 807, including when union members perform or seek actual work that an employer merely did not want or need them to do.

The government reads too much into Congress's response to Local 807. All Congress did in response to Local 807 was to eliminate the wages exception, meaning that the payment of wages between an employer and employee could incur liability under the Hobbs Act. But that response alone tells us little about the circumstances in which the payment of wages for actual work should incur such liability.

At most, Congress signaled an intention to impose Hobbs Act liability on union members who perform or seek actual work when they use "violence and threats" to obtain that work in cases involving analogous facts to those at issue in that case. Id. at 526; see also Enmons, 410 U.S. at 408 (drawing from the Hobbs Act's legislative history in the wake of Local 807 "nothing more than that Congress was intent on undoing the restrictive impact of that case"). But, because of the jury instructions in our case, we must assume that the defendants merely threatened a peaceful picket

to turn around nonunion jobs to maintain the prevailing wage, which is hardly conduct of the type at issue in Local 807. We do not see how we can assume from Congress's reaction to Local 807 that it meant for the Hobbs Act to criminalize peaceful picketing in pursuit of union jobs at the prevailing wage. As a result, Congress's reaction to Local 807 cannot render the jury instructions permissible.

The government also points out that Enmons approvingly cites Kemble -- a Third Circuit decision that introduced the phrase "imposed, unwanted and superfluous services" -- as a proper application of the Hobbs Act. See Enmons, 410 U.S. at 400 & n.5, 409 (citing Kemble, 198 F.2d at 892). In Kemble, a business agent for a union intercepted an out-of-town truck driver unloading a shipment of merchandise. Kemble at 890. The business agent "employed actual and threatened violence against [the driver] and the property in his possession" and told the driver that he would have to have a member of the union help him unload. Id. The court affirmed the business agent's conviction under the Hobbs Acts, holding that

> [I]t was reasonable for the jury to conclude that [the union agent], understanding that [the driver] did not want or need a helper and was not authorized to employ one, nevertheless forcibly insisted that [the driver] pay $10, described as a day's wages, for a supernumerary to do what [the driver] himself was paid to do and was accomplishing when [the union agent] intervened.

-36-

Id.  Kemble described the work sought by the union's agent as "imposed, unwanted and superfluous."  Id. at 892.  As the government points out, the relevant portion of the instructions in our case mirrors that language almost exactly.

However, Enmons's approving citation to Kemble cannot be said to control in our case such that it can save the instructions from being misleading.  The Third Circuit carefully advised that "the forced payment of wages" could incur Hobbs Act liability only "in proper cases," and warned that "[w]e say 'in proper cases' advisedly."  Id. at 891.  In keeping with that caution, the Third Circuit stated its holding quite narrowly:  "It is enough for this case, and all we decide, that payment of money for imposed, unwanted and superfluous services such as the evidence shows [the union's agent] attempted to enforce here by violent obstruction of commerce is within the language and inten[tion] of the statute." Id. at 892 (emphasis added); see also Enmons, 410 U.S. at 409 (noting that Kemble "carefully limited its holding").  The court went on to state that the Hobbs Act protects "the rights of bona-fide labor organizations lawfully carrying out the legitimate objects thereof" and that "the word 'lawfully' is an important limitation."  Kemble, 198 F.2d at 892 (emphasis added).  Thus, the holding in Kemble is limited by the fact that the union's agent engaged in violent conduct that was nowhere sanctioned by federal

-37-

or state law.  Id.  And, again, in our case the instructions permitted the jury to convict the defendants for different conduct entirely -- that is, merely threatening to picket to turn jobs around for the union's members at the prevailing wage.

Ultimately, given the choice between "imposed, unwanted or superfluous," as in Kemble, or "imposed, unwanted, superfluous and fictitious," as in Green, the latter must hold in our case in light of the instructions' inclusion of any picketing as activity that can give rise to Hobbs Act liability when threatened in order to obtain union jobs at the prevailing wage.  The guidance in Enmons (which sometimes uses a conjunctive construction and sometimes a disjunctive one) is less-than-clear, and the facts regarding the means used in Local 807 and Kemble are both distinguishable from the instant case.  The Kemble phraseology is too closely related to the theory of an unfair labor practice rejected in Gamble and American Newspaper for its use in the instructions to have been other than misleading.

Moreover, this conclusion accords with the deference owed under Garmon preemption to the NLRB's interpretation of an unfair labor practice within the meaning of § 158(b)(6).  Under the jury instructions, Hobbs Act liability would appear to attach any time a union threatened to picket peacefully for jobs at the prevailing wage that an employer did not want or need the union's

members to perform.  We find troubling a theory of the case that would criminalize labor union activity to achieve such an end when the NLRB's interpretation of § 158(b)(6) labels the exaction of a wage for that very same end as not being an unfair labor practice. We thus conclude that "it would require statutory language much more explicit than that before us here [in the Hobbs Act] to lead to the conclusion that Congress intended" to criminalize such peaceful picketing, Enmons, 410 U.S. at 411, such that the instructions would not be problematic.  Finally, we note that this narrower interpretation of the Hobbs Act comports with another rule of statutory construction: the rule of lenity.  "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language."  Scheidler, 537 U.S. at 409 (quoting McNally v. United States, 483 U.S. 350, 359-60 (1987)).

It follows that the district court erred in instructing the jury that it could find extortion where the defendants sought to obtain "imposed, unwanted, superfluous or imposed, unwanted, and fictitious work" by using "fear of economic loss," which encompasses picketing protected under the NLRA.  The disjunctive construction impermissibly relieved the government from having to prove that the work was "fictitious" and thus could have allowed

the jury to find a violation merely because the union sought to turn around nonunion jobs to maintain the prevailing wage through such a threatened picket, and the employer did not want to use the union workers to perform the work.

That error alone requires us to at least vacate the counts related to the extortion of nonunion companies, as the government does not argue that the error was harmless. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (referring to "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). In fact, during closing arguments, the government plainly told the jury: "The government agrees that there was, in fact, real work to be done. These were not fictitious jobs we're talking about. For the defendants to be found guilty of extortion on these counts, it doesn't have to be for fictitious work. . . . [T]hese were jobs that were unnecessary, unwanted, and superfluous, and that's why it was extortion." In addition, the court failed to specifically instruct the jury, as the defendants requested, that picketing to alert the public that an employer hires nonunion workers undertaken to maintain the prevailing wage in the community is a legitimate labor objective.

The remaining question is whether we must remand for a new trial on any of the counts for extortion of nonunion companies, as opposed to reversing outright. The answer turns in part on the defendants' other argument: that the evidence is insufficient to support a finding that the defendants pursued illegitimate labor objectives when they threatened to picket if union members were not given jobs. That is, whether the evidence can show that the defendants sought a payoff or payment for work that was fictitious.

Here, with one possible exception, the government has not proven that the union, Burhoe, or Perry demanded work for fictitious services that were not to be performed. Erin Davies (at the BWH event), William Doane and Cary Sakaki (at the U.S. Green Building Council event), Walter Mills (at the Great Bridal event) and Kenneth Maas (at the MGH event) all testified that they did not want, did not need and did not willingly accept the services offered by the union. None of them testified that the jobs in question simply did not exist. Rather, all testified that they would rather not hire union workers, but when faced with the prospect of a picket, they preferred hiring additional workers over risking the impact of the alternative. Again, during closing argument, the government conceded that the jobs were "not fictitious." Not only were the jobs not fictitious, with respect to the four instances listed above, the government failed to prove

-41-

that the union members did not perform actual work.[16]  Thus, we reverse Burhoe's convictions on counts 5, 7 and 13, and Perry's conviction on count 11.[17]

---

[16]  With respect to the possibility that the defendants sought personal payoffs, the government argues that the evidence suffices to show that the defendants did so seek, because the record shows that the hours of work obtained by the strike unit were, at times, directed to union members who were friends and family of Perry and Burhoe.  However, the government does not point to any cases in which a personal payoff was found where someone requested work for union members, work was performed by union members, and payment was made in exchange for that work to union members for their work.  Rather, the payoff scenarios with which we are familiar involve instances where someone sought payment without requesting it in exchange for union members performing any actual work.  See, e.g., United States v. Gibson, 726 F.2d 869, 870-73 (1st Cir. 1984) (holding that a union official's demand for a personal payment of $750 as "consideration" for eliminating any potential union activity at a nonunion job site was a request for a payoff within the meaning of the Hobbs Act).  Without any developed argumentation from the government on this point, we decline its invitation to expand the category of payoffs to encompass this case.

[17]  The government argues, as to all of the counts, that the evidence suffices to show that the defendants did not merely threaten to picket for jobs at the prevailing wage but that they also threatened physical harm and to block entrances, deliveries, and the movement of equipment at some of the nonunion companies' buildings.  However, the government did not object below to the jury instruction that "use of actual or threatened force, violence or fear including fear of economic loss or physical harm is not wrongful under federal law if such use is to achieve legitimate labor objectives."  Nor did the government preserve below the alternative legal theory that if the pursuit of unwanted and superfluous work were a legitimate labor objective (as we hold in this appeal), then force, violence, or fear (including fear of economic loss) may not be used to obtain that objective.  Moreover, consistent with the jury instruction quoted above, the defendants suggest on appeal that, under Enmons, "[u]nion members do not violate the Hobbs Act even if they use physical violence to achieve legitimate union objectives," and the government does not dispute

The only possible exception is the Four Pints incident. There, while one of the owners testified that he believed Burhoe was seeking work and was there to work, another of the owners testified that he had no expectation that the union members would perform any work (and there was no testimony about whether any work was performed). The testimony that money was paid in return for no work at all by the union members leaves open the possibility that the threat of a picket was used to exact a payoff, rather than as a means to obtain actual work. See, e.g., United States v. Duhon, 565 F.2d 345, 351 (5th Cir. 1978) (holding that a payoff made in response to the threat of a picket could constitute extortion under the Hobbs Act so long as the defendants intended to exploit the employer's fear of the economic loss that would result from the picket). We therefore vacate and remand count 4 for a new trial.

## IV. EXTORTION OF UNION MEMBERS

In addition to the above allegations of extortion of nonunion employers, numerous counts alleged that Burhoe and Perry extorted rights to democratic participation ("LMRDA rights"[18]) and wages and benefits from their fellow union members.

---

that assertion. Thus, this alternative legal theory is not available to the government now.

[18] The Labor-Management Reporting and Disclosure Act ("LMRDA") outlines the various rights union members have in the running and

## A.  Background

While the previous section involved the Union's attempt to obtain jobs from nonunion employers, a large portion of the Union members' jobs came from companies that had signed CBAs with the Union.  These companies drew union labor from two pools.  If a company had a seniority list, they would hire workers from that list first.  If a company needed additional workers after it exhausted its seniority list, it would hire spares workers from the union.  Many of the CBAs contained a provision known as the 2003 Rule.[19]  The government alleges that this Rule gave members with trade show experience prior to 2003 priority in the hiring line in that they were supposed to be selected as spares over newer members.  Defendants, meanwhile, contend that companies had

operation of their union.  29 U.S.C. § 401-531.  The requirements of the LMRDA "are designed 'to protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and . . . to keep the union leadership responsive to the membership.'" Harrington v. Chao, 372 F.3d 52, 54 (1st Cir. 2004) (quoting Wirtz v. Hotel, Motel & Club Emps. Union, Local 6, 391 U.S. 492, 497-98 (1968)).

[19]  The relevant provision reads:

> The Employer will take the availability for the following day and fax the availability to the Union by noon.  The Union will fax any objections to those individuals on the list to the Employer by 12:30.  The Employer will not hire anyone who has not worked in the trade show industry prior to April 1, 2003, if there are suitable applicants available who have worked in the trade show industry prior to April 1, 2003.

complete control over whom they would hire as a spare and the 2003 Rule was an unenforceable preference.

The counts on which the defendants were found guilty covered incidents involving union member Edward Flaherty in 2007; an interaction with union member James Lee in 2008; events involving union member Robert Wellman in 2008; and a 2009 CBA vote.

### 1. Edward Flaherty[20]

In September of 2007, union member Edward Flaherty entered the Hynes Convention Center ("Hynes") and had a confrontation with a fellow union member (Robert Favreau) who owed him a gambling debt. The next day, Michael Wellman, chief operating manager for Champion Exposition Services ("Champion"), informed Flaherty that the Massachusetts Convention Center Authority ("MCCA"), which oversees both Hynes and the Boston Convention and Exhibition Center ("BCEC"), was barring him from working at any of their facilities pending an investigation in light of allegations that Flaherty had assaulted Favreau during the previous day's confrontation. Flaherty went down to the BCEC to find out what was going on and called a number of people for help, including Perry. While he was at the BCEC, Perry returned his phone call and, according to Flaherty's testimony, Perry said:

---

[20] Perry Racketeering Act 14, Count 17.

"shut [your] f--king mouth or [I'll] send someone down to shut it for [you]."

Flaherty then went from the BCEC to a South Boston bar, where he had a confrontation with Burhoe that turned violent. Burhoe was charged with assault and battery as a result of the incident. The MCCA ultimately decided to suspend Flaherty for six months and required him to take an anger management course before he could be reinstated.

Flaherty testified that he met with Perry in November of 2007 and Perry told him that if he agreed to drop the charges against Burhoe then Flaherty would get "reinstated at the convention center." Flaherty did not appear at the December 2007 hearing regarding Burhoe's alleged assault and the case was dismissed without prejudice.[21] On December 18, 2007, Flaherty received an anger management certificate. The MCCA reinstated Flaherty in January 2008.

The government alleges that during the time Flaherty was suspended he was replaced by someone else. Although Wellman testified that he did not know who specifically replaced Flaherty, Burhoe and Perry each had family members who worked for Champion

---

[21] In February 2009 Flaherty had the charges reinstated.

in September and October of 2007, the only hours they worked for Champion that year.

### 2. James Lee[22]

In October of 2008 James Lee filed a grievance alleging that Greyhound Exposition Services ("GES") was hiring in violation of the 2003 Rule. A few days after he filed his grievance, Perry confronted him and demanded that Lee identify who had worked ahead of him in violation of the rule. Lee attempted to walk away and Perry reportedly yelled, "Don't you f--ing run[] [a]way from me," called Lee pejorative names and "threw his shoulder into" Lee, "almost knocking [him] over." Lee reported this incident to the Boston Police, but the prosecutor ultimately filed a nolle prosequi. Lee filed another grievance with the NLRB in April of 2009. He testified that nothing happened with that grievance, although he believed that his attorney appealed it.[23]

Lee believed that, as a result of this confrontation, his hours at GES dramatically dropped. He only worked 61 hours for GES in 2008 even though he had worked 345, 310 and 156 hours for them in 2005, 2006 and 2007, respectively. He worked zero

---

[22] Perry Racketeering Act 15, Count 18.

[23] His attorney, Richard Hayes, filed charges with the NLRB alleging that the grievances were not properly investigated and pursued by Perry. The defense entered into evidence a finding of the NLRB that dismissed Lee's charges.

hours for GES in 2009 and 2010.  In 2011, when Perry was no longer in charge, he worked 464 hours with GES.  The government has not argued that anyone worked Lee's hours at GES during the relevant time periods.

### 3.  Robert Wellman[24]

In October of 2008, union member Robert Wellman[25] also filed a grievance against GES and claimed that on October 28, 2008, Perry used physical force against him during a dispute over the grievance.  As stated above, Lee reported Perry's alleged assault to the Boston Police.  Several union members received subpoenas to appear at a clerk's hearing in South Boston District Court concerning this event.  Wellman testified that a few days after this hearing, Burhoe forced him over to union hall to be interviewed by Perry's lawyer concerning the subpoena he had received for the hearing.  He ultimately signed an affidavit concerning the subpoena.  He testified that everything in the affidavit was true.  After he signed the affidavit, Burhoe told Bobby Perry, John Perry's brother, to make sure that Wellman received work at GES.  His admonition was apparently to no effect

---

[24]  Perry and Burhoe: Racketeering Act 16, Count 19.

[25]  Robert Wellman is the brother of Michael Wellman of Champion.

-48-

because, like Lee, Wellman performed little work for GES starting in November of 2008 and continuing through 2010.

### 4. 2009 CBA vote[26]

The 2009 Freeman Decorating Services ("Freeman") and GES CBAs each eliminated the 2003 Rule. Testimony was mixed on who could vote on which CBA, but it was relatively clear that each member was not entitled to vote on every CBA. On April 25, 2009, the GES CBA came up for a vote.[27] Voting took place in the union hall. Union members had to pass through a gate to enter the union hall. At least twenty-nine union members were prohibited from entering the hall. Perry and Burhoe, meanwhile, were inside the gate, accompanied by a police officer. The excluded group felt that they ought to have been admitted and wrote down their names on a piece of paper to memorialize their exclusion. The government presented evidence that many spares who did not work the majority of their hours at GES were allowed to vote on the GES CBA. The GES contract, eliminating the 2003 Rule, passed 67-13.

---

[26] Burhoe and Perry: Racketeering Act 12 and Counts 14 (conspiracy) and 15 (substantive offense).

[27] Although at trial it presented testimony concerning both the Freeman and the GES 2009 CBA votes, in its briefing to us the government has opted to focus only on the GES vote. We will therefore also focus on that vote.

**B. Analysis**

We will treat in turn the two theories of property that the government alleged in this case.

**1. LMRDA Rights**

At trial the government alleged that Burhoe and Perry deprived their fellow union members of "their LMRDA-protected rights to democratic participation in Local 82's affairs by using or threatening physical and economic harm." The government requested special verdicts on this question. For each count alleging extortion of fellow union members, if the jurors found the defendants guilty, they were asked to specify whether they found the defendants guilty on each of two theories: 1) extortion of fellow union members' LMRDA rights; and/or 2) extortion of fellow union members' wages and benefits. In each instance where the jurors found the defendants guilty, they did so under both theories.

The LMRDA rights that the government alleged the defendants interfered with were the excluded union members' "rights to initiate or participate in judicial proceedings, to file grievances and complete affidavits, and to equal treatment in voting." Multiple of our sister circuits have held that LMRDA rights are property within the meaning of the Hobbs Act. See United States v. Bellomo, 176 F.3d 580, 592-93 (2d Cir. 1999);

Debs, 949 F.2d at 201-02; United States v. Local 560, Int'l Bhd. of Teamsters, 780 F.2d 267, 281-82 (3d Cir. 1985). All of these cases, however, predate Scheidler, which held that for the word "obtain" to have any meaning in the Hobbs Act, the property in question has to be acquired. 537 U.S. at 404. The government points us to a Second Circuit case, United States v. Gotti, which held that LMRDA rights can be "obtained" within the meaning of the Hobbs Act. 459 F.3d 296, 323-325 (2d Cir. 2006). The Second Circuit held that Scheidler did not invalidate intangible rights (such as LMRDA rights) as property; rather, "there must be a showing that the defendant did not merely seek to deprive the victim of the property right in question, but also sought to obtain that right for himself." Id. at 300. On the facts of the case before it, where the president of a local branch of a union acted pursuant to directives from an organized crime family, it found that the union members were deprived of their rights and the defendants benefited directly from the deprivation.

Subsequent to Gotti, the Supreme Court handed down Sekhar. There, the Court held not only that the perpetrator had to obtain the property in question, but also that the property had to be transferable, meaning something that could be taken from someone and given to another person. 133 S. Ct. at 2725. Acknowledging that this case casts serious doubts on its argument

-51-

that LMRDA rights constitute property under the Hobbs Act, the government decided to put the weight of its case on the wages and benefits extortion theory, asserting that "[b]ecause the proof on the wages and benefits theory is so strong, there is no reason for the Court to address the defendants' challenges to the LMRDA special verdicts."  Having provided no argument that LMRDA rights do constitute property within the meaning of the Hobbs Act in light of Sekhar, the government has waived this argument and cannot pursue its case on that basis.  Zannino, 895 F.2d at 17 (referring to "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); see also United States v. Vega Molina, 407 F.3d 511, 524 (1st Cir. 2005) (holding that government's failure to make an argument constitutes waiver of that argument); United States v. Caraballo-Cruz, 52 F.3d 390, 393 (1st Cir. 1995) ("[I]n fairness, what is sauce for the defendant's goose is sauce for the government's gander.  Thus, [waiver] applies with undiminished vigor when, as now, a prosecutor attempts to rely on fleeting references to unsubstantiated conclusions in lieu of structured argumentation.").[28]

---

[28]  While the government is free to abandon theories of the case that it no longer wishes to pursue, defendants argue that allowing them to do so in this case causes them substantial prejudice with regards to the remaining counts.  We need not reach these arguments here, however, because we reverse all of the relevant counts on

## 2. Wages and Benefits

We next turn to the government's theory that the defendants extorted wages and benefits from their fellow union members. In analyzing the government's argument under this theory, we will do well to remember the definition of Hobbs Act extortion: "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). We will take the elements of this definition in turn.

### a. Property

The government presents two separate wages and benefits theories. First, the government alleges that work was taken away from particular members and given to others. This is the case with Flaherty, who the government argues was denied work that was then redirected to Perry and Burhoe's family members. There is further suggestion of this in the counts relating to Lee and Wellman in that those two individuals had reduced hours, although the government does not contend that anyone worked in their place. The second theory that the government puts forth relates to the workings of the 2003 Rule. Under this theory, the apparent

---

sufficiency of the evidence grounds.

simplicity of the phrase "wages and benefits" actually masks the fairly complex theory of the property at issue. This theory differs from the first in that no straightforward transfer of wages and benefits took place. Rather, as a result of the defendants' threats, certain union members "gave up" their seniority protections under the 2003 Rule that would have led to wages and benefits. The government argues that this rule gave union members identifiable positions in the hiring line, and that members then gave these positions to the defendants. However, the defendants argue that the 2003 Rule was not powerful or binding enough to give identifiable seniority protections to the members, but was rather merely an unenforceable hiring preference.

We analyze two aspects of these property theories to determine whether the government's arguments under its wages and benefits theory fall within the meaning of the Hobbs Act: first, under Scheidler, the government must prove that the defendants obtained the property taken. 537 U.S. at 404. It is not enough that the victims merely have lost something, the defendants have to have that thing as well. Second, under Sekhar, the property in question has to be capable of transfer from one person to another. 133 S. Ct. at 2725. Acquisition is not enough.

Thus, the government had to prove that the defendants obtained the property at issue. Scheidler, 537 U.S. at 404. In

only one instance, that of Flaherty, did the government even attempt to prove that anyone worked any hours that might otherwise have been given to the victim. In all other instances, the government sought to prove only that the victims had reduced hours, not that anyone worked in their place. In support of this approach, the government cites Green, in which the Supreme Court held that Hobbs Act extortion "in no way depends upon having a direct benefit conferred on the person who obtains the property." 350 U.S. at 420. While it is true that Scheidler appears to have left Green intact, 537 U.S. at 402, Green cannot be read so expansively as to negate the requirement that the defendants "obtain" the property. In Gotti this requirement was met by demonstrating that the defendants directly benefited from the deprivation of the victims' property. Here, the government did not show such a direct benefit. The government seems to suggest throughout that friends and family members of Perry and Burhoe worked in place of the victims, but, again with the exception of Flaherty, it does not point us to specific evidence in this regard.[29]

---

[29] In particular, the fact that friends and family of Burhoe and Perry worked is insufficient to demonstrate that the hours worked were a result of hours taken from Lee or Wellman.

Without a showing that anyone worked in place of the alleged victims, the government's theory seems to be reduced to an argument that the defendants controlled the property and received an unidentifiable benefit from that control. It is hard to reconcile this argument with Scheidler, where the Supreme Court specifically rejected the theory that whoever controls use of certain property thereby obtains that property. 537 U.S. at 401-02. In light of Scheidler, the government had to prove that the defendants not only controlled the property, but also obtained it in the sense that they could "exercise, transfer, or sell" it. Id. at 405. In the case of Flaherty, this "transfer" was demonstrated by showing that family members worked hours at Champion during the relevant time period when Flaherty was out of work, and not any other time. For Lee and Wellman, however, the government does not argue that anyone worked in their place who would not have worked.[30] At most, this means that the government has demonstrated a taking from Lee or Wellman, but does not demonstrate that Perry obtained this property in the sense of being

---

[30] The only evidence the government presented that individuals with no trade show experience prior to 2003 were working ahead of others with the requisite experience was the testimony of the union members themselves who believed that they were losing hours to people who should not have received the benefit of the 2003 Rule. No specific instances were cited.

able to "exercise, transfer, or sell" it.[31]  Id.  This is insufficient.  At a minimum, Scheidler stands for the proposition that, to prove that the property was obtained, the government needs to do more than demonstrate control.  The government's theory that Perry controlled work to the benefit of his friends and family risks merging the concepts of control and obtention.  The weakness of the government's case with regard to the obtaining of property can be more clearly seen when we analyze whether the property was capable of being transferred.

Under Sekhar, in order for something to be "property" within the meaning of the Hobbs Act, it is insufficient for the government to show that someone has been deprived of their property; the government must show that it was transferred to someone such that they obtained it.  133 S. Ct. at 2725.  The protections afforded by the 2003 Rule cannot themselves be transferred, rather, it is the alleged spot in the hiring line

---

[31]  The government provided evidence that Perry exercised a general level of control over who worked at particular shows.  Lisa Buckley, an administrative assistant for Local 82 up until January or February of 2009, testified that she would receive hiring lists from the different companies who had work for union members, give the lists to Perry, and receive the final lists of who was being hired back from him.  She said that Perry made changes to these lists about fifty percent of the time.  A "good majority" of the time, the added names were friends and family of Perry.  No specific instances of these changes were identified, however, and Ms. Buckley did not give any testimony concerning the pre-2003 experience of any of the individuals taken off or put on the lists.

afforded by the 2003 Rule that the government argues was transferred from certain union members to certain others. It is difficult to reconcile this argument with Sekhar, however. In the absence of the 2003 Rule, the benefit that it conveyed (whether a hiring preference or a particular spot in the hiring line) is not transferred to another person, it is simply eliminated. Although a consequence of eliminating the rule might be that individuals who used to benefit from it will get fewer future hours of work, the elimination of the rule itself is not a transfer of those hours and does not transfer a property right.[32] We therefore find that the government has failed to demonstrate that the thing extorted under counts 14 and 15 (2009 CBA votes) was property capable of being transferred or obtained, as required by the Hobbs Act.

We need not reach the question of whether the defendants obtained property from the individual union members (Flaherty, Lee and Wellman), because the requirement that property be

---

[32] The government's inability to point to specific individuals who replaced the alleged victims suggests that this spot in the hiring line was perhaps less transferable, even in the sense identified above, than the government alleges. At most, the evidence suggests that Perry had significant influence over who worked for some companies or shows. This does not amount to a showing that a particular spot in the hiring line was transferred from a particular person (Lee or Wellman, for example) and given to someone else.

transferable poses particular challenges to the government under the second element of Hobbs Act extortion: consent.

### b. Consent[33]

Even if we accept the government's definition of transferable property, the government still faces considerable difficulties in proving consent to this alleged taking. United States v. Cain, 671 F.3d 271, 283 (2d Cir. 2012) ("[Consent is] the razor's edge that distinguishes extortion from robbery" and "[t]he essential requirement to establish extortion is thus that the victim retained 'some degree of choice in whether to comply with the extortionate threat, however much of a Hobson's choice that may be.'" (quoting United States v. Zhou, 428 F.3d 361, 371 (2d Cir. 2005))). We do not find evidence that any of the union members voluntarily abandoned either their spot in the hiring line or their wages and benefits. Rather, the evidence showed that the victims strenuously resisted whenever any takings occurred.

---

[33] Arguably the defendants waived the question of consent by failing to raise it in their opening briefs. United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998) (noting that "issues raised for the first time in an appellant's reply brief are generally deemed waived"). At oral argument, however, the government did not argue waiver and instead spent considerable effort arguing against the defendants on the substance of this issue. We therefore do not see any prejudice to the government in taking up the claim. See also Thomas v. Arn, 474 U.S. 140, 155 (1985) (recognizing that in instances of "nonjurisdictional waiver," the Court of Appeals "may excuse the default in the interests of justice").

Without consent, the government may be able to prove a taking, but it cannot prove extortion.

When Flaherty found out he was barred from MCEC venues, he immediately went down to BCEC to find out what was happening, placed numerous calls to try to find help, and even after he received the alleged threat from Perry, called "[a]nybody I knew politically to try to help me out . . . [t]o try to get me back to work." If Perry took anything of value from Flaherty, it was clearly not with Flaherty's consent. The one thing he did testify to consenting to give up was his right, as articulated by the government, "to institute an action in court and to appear as a witness free of any limitation by Local 82 or its agents in a judicial proceeding involving assault and battery charges against defendant Joseph Burhoe." But this corresponds to the government's LMRDA rights theory, not its wages and benefits theory. There is no connection between this consented-to taking and the taking of Flaherty's wages and benefits. The jury may have found that Flaherty was able to return to work as a result of this consented-to action, but that does not transform the property obtained from his right to institute a court action into the wages and benefits that he lost as a result of Perry's alleged actions.

Similarly, Lee testified that, a few weeks after his confrontation with Perry, he communicated his availability to work

-60-

to GES and "was told right away there was nothing for me." Undeterred, Lee continued to call in his availability to GES every time it had a show.  As with Flaherty, the evidence falls short of showing that Lee's wages and benefits were voluntarily relinquished.  Lee persisted in trying to get work.  The jury may have believed that Perry threatened him and that Perry later played a role in reducing his hours, but this does not amount to a consented-to taking of Lee's wages and benefits.  Lee filed multiple grievances against both GES and Freeman and gave every indication that he was persisting in protesting the taking of his spot in the hiring line.

The Wellman count suffers the same defect.  Wellman called in for work "every single time that they had a show."  He did not consent to have his hours taken from him, even if the government proved that they were in fact taken.  Moreover, he continued filing grievances against GES, so it cannot even be said that he consented to stop filing grievances (assuming the government was able to prove a connection between continuing to protest the failure to uphold the 2003 Rule and the lost wages).

### c.  Threats

At oral argument the government emphasized that it did not actually have to prove that any property was obtained with anyone's consent, only that the defendants attempted to take

property with the union members' consent because all of the counts in the indictment alleged actual or attempted extortion. The government thus argues that all of the threats indicated above (the physical threats/actual violence committed against Flaherty, Lee, and Wellman, and the menacing presence at the 2009 CBA vote) were attempts to communicate the threat that the victims must consent to their property being taken to protect themselves from actual violence or economic harm. We reject the government's theory.

The defendants' threats must have the specific purpose of inducing another to part with his or her property. Coppola, 671 F.3d at 241. Here, the government demonstrated that Perry already had control over the union members' wages and benefits before any of the alleged threats. For this reason, for each of the threats it identifies, the government argues that Perry intended to communicate that further harm would result if the union member persisted in opposing the alleged taking, or continued to speak up against it.

For example, the government alleges that Flaherty could interpret Perry's response to his request for help with his suspension as a threat that, "if Flaherty persisted in trying to get back to work, and earn the wages and benefits that came with it, Perry . . . would have him beaten," and that, "Perry used the

threat of physical violence to attempt to silence Flaherty and to obtain and redirect wages that could have been Flaherty's to others." Under this argument, however, what Perry's threats were attempting to induce Flaherty to part with was Flaherty's "persistence" and his "silence." The government does not argue what the relationship between this persistence or silence and Flaherty's wages and benefits was, nor do we think it can posit one. Flaherty's wages and benefits had already been taken before the threat and were returned after he consented to give up something unrelated (his right to pursue a criminal action against Burhoe). There simply was no attempted taking of wages and benefits of Flaherty; rather, there was a successful taking that did not amount to extortion.

Similarly, the government alleges that Perry's message to Lee was "if Lee persisted in attempting to vindicate his contractual right to preferential hiring, he would lose the ability to work and earn wages entirely and might also be physically harmed." Again, what Perry attempted to obtain was the termination of Lee's persistence, although he failed to do so given Lee's continued filing of grievances and persistent attempts to obtain hours at GES.

With regard to Wellman, the government argues that the jury could have believed that the threat was that Wellman "could

either accept the status quo -- under which Perry and Burhoe gave some of the jobs and wages that should [have] gone to Wellman to their friends, family, and supporters -- or he could have no jobs, no wages, and possibly be hurt or killed." This accounting is the clearest statement of the government's attempt theory. The government's argument in each instance amounts to asking us to assume that the threat was an attempt to obtain consent to the status quo -- a state in which Perry already exercised considerable influence over union members' wages and benefits. However one might characterize such a surrender, it cannot reasonably be portrayed as a consented-to surrender of wages and benefits under the Hobbs Act.

The government argues that during the 2009 CBA vote, "Perry and Burhoe stood by the gate outside the union hall in a calculated attempt to instill in the excluded members a fear of physical harm if they persisted in their effort to vote or otherwise influence the outcome of the vote." At most, this indicates a threatened taking of a vote, which is also not a threat to obtain wages and benefits.

The fatal flaw in the government's theory of attempted extortion of wages and benefits is that it fails to include a meaningful difference between attempted extortion of wages and benefits and attempted extortion of LMRDA rights. All of the

threats identified above are more proximately connected to the exercise of LMRDA rights (voting, filing of grievances, instituting legal actions) than they are to particular wages and benefits. Yet, as explained above, the government has waived the argument that those rights constitute transferable property within the meaning of the Hobbs Act. Zannino, 895 F.2d at 17. Requiring only a link between nontransferable property and transferable property (here the alleged link being the exercise of LMRDA rights has an impact on wages and benefits) in order to transform a taking of nontransferable property into Hobbs Act extortion would render the holding in Sekhar weightless. After all, the thing allegedly extorted in Sekhar, "the general counsel's 'intangible property right to give his disinterested legal opinion to his client free of improper outside interference,'" was connected to transferable property (an investment of money in a fund), but the property was not of the kind contemplated under Hobbs Act extortion. 133 S. Ct. at 2723, 2727. Here the attempted extortion was at most directed at rights to file grievances, pursue court actions and vote. Although the government may posit that there is a connection between these rights and wages and benefits, attempted extortion of the one cannot equate to attempted extortion of the second without eliminating the distinctions made in Scheidler and Sekhar

between obtainable, transferable property and nonobtainable, nontransferable property.

For this reason, the threats the government identifies constitute attempts at coercion rather than attempts at extortion. Coercion is the use of "threats and acts of force and violence to dictate and restrict the actions and decisions of [individuals]." Scheidler, 537 U.S. at 406. Coercion was specifically not included in the Hobbs Act, indicating that Congress intended to include the greater crime of extortion but not the lesser crime of coercion. Id. All of the threats identified above were, at most, directed at forcing individuals to abandon particular actions (grievances, general opposition), but they cannot be construed to have been attempts at obtaining property with the victims' consent, particularly given that Perry already allegedly controlled the victims' access to wages and benefits, with or without the threats.

Ultimately, "[t]he Government's shifting and imprecise characterization of the alleged property at issue betrays the weakness of its case." Sekhar, 133 S. Ct. at 2727. We therefore reverse Burhoe's convictions on counts 14 and 15 and Perry's convictions on counts 14, 15, 17, 18 and 19.

## V. RACKETEERING AND REMAINING CONSPIRACY COUNTS

Counts 1, 2 and 3 remain. Burhoe and Perry were both found guilty of count 3, which alleged that:

> the defendants and their co-conspirators agreed to obtain property of various entities throughout Boston, including hotels, event planners, catering companies, pharmaceutical companies, hospitals, music entertainment companies, and nonprofit organizations, to wit: money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services; with the consent of such entities, their officers and agents, which consent was induced by the wrongful use of actual and threatened force, violence, and fear of economic and physical harm to said entities and others.

We have, however, reversed the convictions on the extortion counts with regards to Perry and all but count 4 (Four Pints) with regards to Burhoe. The convictions on count 3 can therefore only stand if the facts concerning Four Pints, standing alone, can support the government's conspiracy allegations.

We find insufficient evidence to connect Perry to the single remaining extortion count and we therefore reverse Perry's conviction on count 3. We also reverse with regards to Burhoe. The facts presented by the government, in light of our reversal of the other counts, indicate that if Burhoe committed extortion, he extorted only one company, Four Pints. The government presented no evidence to support a finding that there was a conspiracy to extort Four Pints. The only evidence the government presented with regards to Four Pints was the testimony of two of its owners, who only spoke of an interaction with Burhoe. While it is true that Burhoe was not the only one to profit from Four Pints (the checks cashed had different names in the payee line) this is

insufficient to prove an agreement between Burhoe and Perry, or Burhoe and anyone else, to extort Four Pints. United States v. Morales-Machuca, 546 F.3d 13, 20 (1st Cir. 2008) (Hobbs Act conspiracy requires "an intent to agree and an intent to commit the substantive offense." (quoting United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000))).

Count 1 alleged racketeering and count 2 alleged racketeering conspiracy. The government contended that Local 82 itself was a racketeering enterprise. Having reversed all but one of the extortion count convictions, we are left with at most one racketeering act by Burhoe. Because the government was required to prove a "pattern of racketeering activity," which has been defined as requiring at least two predicates, we find insufficient evidence to support Burhoe and Perry's convictions on count 1. Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1561 (1st Cir. 1994). We also find insufficient evidence to meet the government's burden as to count 2. While it is unnecessary to prove that the defendants committed two predicate offenses in order to prove a racketeering conspiracy, the government does have to prove that the defendants "agreed with one or more others that two predicate offenses be committed." Id. at 1562. Because we find that only one of the predicate acts might constitute extortion, we find that the government provided insufficient evidence that the

-68-

defendants agreed to engage in a pattern of racketeering activity. We therefore reverse Burhoe and Perry's convictions on count 2.

## VI. PROHIBITION AGAINST CERTAIN PERSONS HOLDING OFFICE

There is one remaining count of the indictment that we have yet to consider. Count 29 charged Burhoe and Perry with violating 29 U.S.C. § 504(a), which prohibits persons with certain criminal convictions from serving in particular capacities within a union. In relevant part, § 504(a) prohibits anyone convicted of certain enumerated offenses from willfully serving, inter alia, as a consultant, advisor, officer, director, trustee, member of the board, or "representative in any capacity" of a labor organization within thirteen years after the term after the imprisonment for that conviction ends. It further bars anyone from willfully retaining such a person to serve in any of those capacities in violation of the statute. The parties stipulated that Burhoe had been convicted of a disqualifying crime and that his imprisonment had ended within thirteen years before the conduct at issue in this case. The defendants' violations of this prohibition hinges, therefore, on whether Burhoe was acting in one of those particular capacities, even though he did not hold an official union position. The jury convicted both Burhoe and Perry on this count.

Preliminarily, as we have either reversed or vacated all the extortion convictions within the meaning of the Hobbs Act, we find it necessary to state that nothing in our analysis of those Hobbs Act counts casts doubt on the evidence showing that the defendants actually threatened certain actions for certain purposes. While those actions may not be of a kind that suffices to prove "wrongful" conduct under the Hobbs Act, they may still be considered as to the separate question of whether Burhoe was acting as a prohibited person, or whether Perry retained him as such.

The defendants raise two principle contentions: 1) that the government's evidence was legally insufficient to show that Burhoe served as a union steward or representative in any capacity, and 2) that the government failed to establish that Burhoe was not eligible to serve in a union position. As to their first contention, the defendants claim that Burhoe was not a qualifying union representative within the meaning of § 504(a) as he never held a formal union position, but rather acted as an unofficial company foreman. The government disagrees, arguing that § 504(a)'s "representative in any capacity" language is sufficiently broad to encompass service as an informal representative, and that it presented sufficient evidence that Burhoe held himself out as a union representative, union members and employers viewed him as such, and that Perry directed him to

act accordingly.  The government's argument was perhaps best addressed in its opening statement at trial.

> Burhoe acted as a representative of Local 82 in several ways.  He acted as a representative of Local 82 management when he extorted Ed Flaherty's ability to express his views about John Perry.  He acted as a representative of Local 82 management when he extorted Robert Wellman's ability to testify on behalf of Edward Lee about Perry's assault in the BCEC.  He acted as a representative of Local 82 management when he provided muscle for members of Local 82 from coming into the union hall to exercise their equal right to democratic participation on the business of the union.  He acted as a representative of Local 82 when he extorted payoffs for superfluous, unneeded, fictitious work from nonunion businesses, work they didn't need or want.  And Burhoe acted as a representative of Local 82 when he decided who got called to work for certain union employers in Boston.

We review questions of statutory interpretation de novo. United States v. Hartsock, 347 F.3d 1, 4 (1st Cir. 2003).  After review, we decline the defendants' invitation to view § 504(a) so narrowly as to limit its application to official union representatives.  To the contrary, we view the "representative in any capacity" language of § 504(a) as sufficiently broad to include Burhoe's sustained de facto delegation and exercise of union authority with Perry's knowledge.  Had the drafters of § 504(a) sought to limit the application of the statute to only encompass holders of official positions, they would have explicitly done so. Nothing in the statutory language suggests such a narrow interpretation.  See United States v. Int'l Bhd. of Teamsters,

-71-

Chauffeurs, Warehousemen, and Helpers of America, AFL-CIO, 838 F. Supp. 800, 813 (S.D.N.Y. 1993) (refusing to narrowly interpret § 504(a) to paid individuals); see also Brown v. United States, 334 F.2d 488, 492 (9th Cir. 1964), aff'd, 381 U.S. 437 (1965). The clear language of § 504(a)(2) intentionally leaves open the category of "representative of any capacity" as to distinguish it from the other official positions delineated within the subsection. The broader interpretation is consistent with the § 504(a)'s intent to prevent persons with certain criminal convictions from exerting power within labor unions. See Brown, 334 F.2d at 492.

Viewing the evidence presented in the light most favorable to the verdict, United States v. Walker, 665 F.3d 212, 220 (1st Cir. 2011), we find that the evidence presented by the government was sufficient to show that Perry used Burhoe as a qualifying representative of the Union in a de facto capacity, falling within the meaning of § 504(a).

We turn to the defendants' second contention that the government failed to establish that Burhoe was ineligible to serve in a union position. Section 504(a) establishes exceptions to the prohibition on holding office by providing that it applies unless, prior to the end of the thirteen year bar, either the defendant's citizenship rights are restored (if they had been revoked because

of the underlying conviction) or the sentencing court for the underlying conviction determines that the defendant may nevertheless serve as a union official. The defendants argue that this "unless" clause establishes an element of the crime, and the government's failure to offer any evidence as to this element renders the evidence insufficient to support the conviction. While neither defendant states that the "unless" clause applies to Burhoe, they suggest that the government was required to present some evidence to establish the alleged element. The defendants point to two statutes in which an "unless" clause establishes an element of the crime that the government must affirmatively prove: 8 U.S.C. § 1326, criminalizing reentry into the United States unless the Attorney General consents to reentry, see United States v. Earle, 488 F.3d 537, 539-46 (1st. Cir. 2007), and an obsolete Washington D.C. statute from 1967, D.C. Code Ann. § 22-201 (repealed 2003), criminalizing abortion unless necessary for the mother's health. See United States v. Vuitch, 402 U.S. 62, 67-71 (1971).

The government counters that § 504(a)'s "unless" clause does not establish an element of the crime, but rather constitutes an affirmative defense that the defendants bear the burden to prove. The government equates the current case to our finding in United States v. Bartelho, in which we held that a showing that

-73-

the defendant's civil right to carry had not been restored was not an element of 18 U.S.C. § 921(a)(20)'s prohibition of certain persons to possess a firearm, 71 F.3d 436, 439-440 (1st Cir. 1995). Therefore, the government contends that the district court properly held that the government was under no obligation to prove "the non-restoration of" Burhoe's rights.

Because the defendants failed to previously object to this issue, we review for plain error, United States v. Ponzo, 853 F.3d 558, 570 (1st Cir. 2017), requiring that the defendants meet the onerous task of showing both that any error was clear or obvious, and that it affected their substantial rights. United States v. Karmue, 841 F.3d 24, 27 (2016); United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012). They fail to do so. The defendants have failed to show that the "unless" clause of § 504(a) clearly or obviously sets forth an additional element of the offense. We note that the defendants did not challenge either the indictment or the jury instructions given by the district court on count 29 with respect to the fact that neither included the "unless" clause as an element of the offense. In addition, the defendants' own proposed jury instructions as to count 29 failed to list this "unless" clause as an element of the offense. In light of this acquiescence, we struggle to find a clear or obvious error. See United States v. Ríos-Hernández, 645 F.3d 456, 463 (1st

Cir. 2011) (finding no clear or obvious error where defendant acquiesced to characterization of prior convictions as crimes of violence); see also United States v. Turbides-Leonardo, 468 F.3d 34, 39 (2006) (finding no clear or obvious error where defendant seemingly acquiesced to the PSI report and the district court accordingly sentenced the defendant). The plain language of the statute reasonably lends itself to the same conclusion reached by the district court. Thus, to the extent that the district court erred at all, that error was not plain. See United States v. Marcano, 525 F.3d 72, 74 (1st Cir. 2008).

Finding the evidence presented at trial sufficient to convict Burhoe and Perry of violating 29 U.S.C. § 504(a), we refrain from disturbing the jury's verdict and affirm the defendants' convictions as to Count 29.

## VII.  CONCLUSION

For the reasons stated above, we **REVERSE** Perry counts 1, 2, 3, 11, 14, 15, 17, 18 and 19.  We **REVERSE** Burhoe counts 1, 2, 3, 5, 7, 13, 14, 15, and 19.  We **VACATE AND REMAND** Burhoe count 4.  We **AFFIRM** Burhoe and Perry count 29.